UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


ROGER D. HENSON,            )
                                         )
                Plaintiff,     )
                                         )
         v.              )      No.  4:12CV1888 ACL
                                         )
CAROLYN W. COLVIN, Acting     )
Commissioner of Social Security,[1]    )
                                         )
               Defendant.    )


## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Roger D. Henson's application for

disability insurance benefits (DIB) under Title II of the Social Security Act, 42

U.S.C. §§ 401, *et seq.*  All matters are pending before the undersigned United

States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. §

636(c).  Because the Commissioner's final decision is supported by substantial

evidence on the record as a whole, it is affirmed.

### I.  Procedural History

On August 25, 2010, the Social Security Administration denied plaintiff

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.
As such, she is substituted for Michael J. Astrue as the defendant in this cause of action.  Fed. R.
Civ. P. 25(d).

Roger D. Henson's July 14, 2010, application for DIB in which he claimed he became disabled on May 20, 2010, because of degenerative disc disease and herniated discs with related scar tissue. (Tr. 61, 62, 70-74, 116-22, 158.) On September 24, 2010, plaintiff completed a Disability Report in which he claimed he suffered from a new impairment, and specifically, depression. (Tr. 192.) Upon plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ) on July 8, 2011, at which plaintiff and a vocational expert testified. (Tr. 33-60.) On July 20, 2011, the ALJ issued a decision denying plaintiff's claim for benefits, finding plaintiff able to perform work as it exists in significant numbers in the national economy, and specifically, office helper, laundry press operator, and cashier. (Tr. 18-29.) On August 24, 2012, upon review of additional evidence, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-5.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff contends that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff claims that the ALJ erred by finding plaintiff's depression not to be a severe impairment. Plaintiff also claims that the ALJ erred by finding plaintiff to have the residual functional capacity (RFC) to perform light work

inasmuch as the medical evidence showed him to have physical restrictions that precluded such work. Plaintiff requests that the final decision be reversed and that the matter be remanded for further consideration. For the reasons that follow, the ALJ did not err in his determination.

## II. Testimonial Evidence Before the ALJ

A.  <u>Plaintiff's Testimony</u>

At the hearing on July 8, 2011, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was forty-two years of age. Plaintiff stands five-feet, ten inches tall and weighs 170 pounds. Plaintiff is right-handed. Plaintiff is divorced and has one child under eighteen years of age. Plaintiff completed high school. Plaintiff lives in a trailer on his father's property. Plaintiff's father loans him money for expenses. (Tr. 35-36, 48.)

Plaintiff's Work History Report shows him to have worked as a delivery driver for beverage sales from July 1992 to July 1998. From July 1998 to May 2003, plaintiff worked as a route salesman for a dairy company. From May 2003 to July 2004, plaintiff worked as a driver for a lumber company. From July 2004 to May 2010, plaintiff worked as a forklift operator at a pallet company and as a loader for parcel delivery. (Tr. 167.)  Plaintiff testified that he stopped working on

May 20, 2010, because of a work-related injury.  (Tr. 37-38.)

Plaintiff testified that he has five herniated discs in his back that cause him constant pain and that such pain radiates to his legs.  Plaintiff testified that the pain ranges between four and nine on a scale of one to ten.  (Tr. 41, 43.)  Plaintiff testified that walking, bending, reaching, and lifting aggravate his pain.  To relieve his pain, plaintiff testified that he sits in his recliner, alternately applies ice packs and heat packs, and takes pain medication.  (Tr. 44-45.)  Plaintiff testified that his medications cause him to have dry mouth, headaches, constipation, and shakiness. (Tr. 49.)

Plaintiff testified that he has used a cane since his injury, because his legs sometimes go numb and give way when he walks long distances, such as half a mile.  Plaintiff testified that he can comfortably lift and carry five pounds, and that lifting a greater amount aggravates his back pain and makes his condition progressively worse.  (Tr. 42-43.)

Plaintiff testified that he had back surgery in 2000 to "drain [his] discs." Plaintiff testified that surgery was suggested for his May 2010 back injury, but that he was afraid of becoming paralyzed and declined the suggestion.  Plaintiff testified that he has had three injections to his back since the injury.  (Tr. 47.)

Plaintiff testified that he also suffers from depression as a result of his

inability to work.  (Tr. 48.)

As to his daily activities, plaintiff testified that he gets up around 5:00 or 6:00 a.m., but he awakens twice during the night because of pain.  Plaintiff testified that he sits in his recliner six or seven hours a day but he seldom naps.  (Tr. 45.)  Plaintiff testified that he watches television.  Plaintiff testified that he performs household chores, such as washing dishes and small loads of laundry, but that he takes breaks while doing so.  Plaintiff testified that he drives, but he has difficulty getting in and out of the car and with driving long distances.  Plaintiff testified that he can care for his personal needs, but he takes his time and leans on things while doing so, because of his difficulty with bending.  (Tr. 49-51.)  As for hobbies and social activities, plaintiff testified that he plays pool once every month or two months when he feels well enough.  (Tr. 51-52.)  Plaintiff testified that he goes to bed around 10:00 p.m.  (Tr. 45.)

B.    Testimony of Vocational Expert

Dr. Karen E. Nielsen, a vocational expert, testified at the hearing in response to questions posed by the ALJ.

Dr. Nielsen classified plaintiff's past work as a delivery driver and forklift operator as medium and semi-skilled; as a loader as heavy and unskilled; and as a route salesman and outdoor salesman as light and semi-skilled, possibly medium as

actually performed by plaintiff.  (Tr. 54-57.)

The ALJ asked Dr. Nielsen to assume an individual of plaintiff's age, education, and past relevant work experience and to further assume the individual to be capable of performing light work but had to change positions at will.  Dr. Nielsen testified that such a person would not have any transferable skills to light work, but could perform light *unskilled* work as an office helper, of which 3,100 such jobs exist in the State of Missouri and 190,000 nationally; laundry press operator, of which 1,850 exist in the State of Missouri and 200,000 nationally; and cashier, of which 5,400 exist in the State of Missouri and 250,000 nationally.  (Tr. 57-58.)

### III.  Medical Records Before the ALJ

Plaintiff was admitted to the emergency room at Phelps County Regional Medical Center on July 15, 2009, with complaints of moderate back pain aggravated with movement.  It was noted that plaintiff had similar symptoms previously.  Plaintiff was diagnosed with acute sciatica and was discharged that same date in stable condition.  (Tr. 222-23.)

Upon referral by plaintiff's general practitioner, Dr. W. David Myers, plaintiff visited Family Nurse Practitioner Barbara C. Fulton at Central Missouri Pain Management on April 20, 2010, who noted plaintiff to be in no apparent

distress.  Plaintiff's eye contact was good, his affect was normal, and his short-term memory was good.  Mental status examination was normal with no sign of mental defect.  Physical examination was essentially normal but with decreased sensation noted on the left.  Plaintiff complained of low back pain radiating to the buttocks and down the left hip and leg.  Plaintiff also reported having tingling in both feet.  Plaintiff reported the leg pain being worse than the back pain and that, overall, the pain had worsened over the previous year.  Plaintiff reported the pain to start with a lifting injury at work.  Plaintiff reported the pain to be at a level three on a scale of one to ten but that it increased with any activity.  Plaintiff reported improvement with lying flat and taking pain medication.  Plaintiff was diagnosed with lumbar radiculopathy and bilateral lower extremity paresthesia.  Plaintiff's current medications were Soma and Percocet, which plaintiff reported to be very helpful.  Plaintiff expressed hesitation to undergo injection therapy.  An MRI was ordered.  FNP Fulton instructed plaintiff to continue with his pain medications as prescribed by Dr. Myers.  (Tr. 216-17.)

Plaintiff visited Dr. Myers on April 29, 2010, to obtain medication refills for his diagnosed condition of degenerative disc disease of the lumbosacral spine. Prescriptions for Endocet and Soma were refilled.  (Tr. 260.)

An MRI of the lumbar spine on May 7, 2010, showed right paracentral disk

protrusion at the L1-2 level contacting the central cord, but with no significant central canal stenosis or neural foraminal narrowing; minimal circumferential disk bulge at the L2-3 level, but without evidence of central canal stenosis or neural foraminal narrowing; small broad-based central disk protrusion at the L3-4 level, but without evidence of central canal stenosis or neural foraminal narrowing; small broad-based central disk protrusion at the L4-5 level and flattening of the ventral thecal sac, with enhancing soft tissue density likely representing scar formation impinging upon the left L4 nerve root and resulting in mild left neural foraminal narrowing; and small central disk protrusion at the L5-S1 level with annular tear, and a small amount of scar tissue noted to be in contact with the left S1 nerve root. (Tr. 214-15.)

Plaintiff visited Dr. Myers on May 17, 2010, and complained of pain radiating down his left leg for a period of one week. Plaintiff reported the pain to be worse after working. Physical therapy and epidural injections were considered. (Tr. 260.)

Plaintiff returned to FNP Fulton on May 20, 2010, and reported a worsening of pain. FNP Fulton noted plaintiff to experience increased pain with range of motion about the lumbar spine. Sensation was noted to be slightly diminished in the left lower extremity. Straight let raising was positive on the left. Plaintiff was

diagnosed with lumbar radiculitis.  (Tr. 218-19.)

Plaintiff was admitted to the emergency room at Phelps County Regional Medical Center on May 20, 2010, with complaints of back pain after having lifted approximately 130 pounds at work.  Plaintiff reported the pain to worsen with movement, standing, and walking.  Plaintiff's current medications were noted to be Percocet and Soma.  (Tr. 239-40.)  Physical examination upon admission to the hospital showed limited range of motion and function in the extremities due to severe pain.  No sensory loss was noted.  Deep tendon reflexes were 2/4 in the upper and lower extremities.  When comparing the MRI conducted less than two weeks earlier, the examiner noted there had been no significant change in the plaintiff's spine.  Plaintiff was diagnosed with intractable low back pain.  (Tr. 228-31, 237.)  Plaintiff was discharged on May 22, 2010, with a diagnosis of acute intractable low back pain secondary to lumbar muscle spasm.  Final progress notes showed plaintiff to be neurologically intact with no sensory loss and negative straight leg raising.  Plaintiff was instructed to resume his usual home medication and to engage in activity as tolerated, with back precautions regarding lifting.  (Tr. 226-27.)

On May 28, 2010, plaintiff visited Dr. R. Peter Mirkin at Tesson Ferry Spine & Orthopedic Center for an orthopedic spine consultation.  Physical examination

showed plaintiff to walk with an upright gait. Range of motion about the lumbar spine was twenty percent of normal, and straight leg raising was markedly positive on the left. Weakness in the left foot dorsiflexor was noted. Dr. Mirkin noted the recent MRI results and also noted that x-rays showed severe degenerative changes at the L4-5 and L5-S1 levels. Dr. Mirkin opined that plaintiff had symptomatic disc disease and recommended physical therapy and epidural steroid injections. Dr. Mirkin reported that plaintiff was currently unable to work. (Tr. 303.)

On June 3, 2010, Dr. Myers refilled plaintiff's prescriptions for Endocet and Soma. (Tr. 260.)

Plaintiff visited Dr. Michael S. Boedefeld at Professional Pain Physicians on June 8, 2010, with complaints of radiating low back pain having an onset of over one year prior. Plaintiff was noted to be using a cane. Plaintiff described the pain as moderate and constant and to be about the same as previous episodes of pain. Plaintiff reported his pain to worsen with exercise, walking, sitting, standing, lying down, climbing stairs, rolling in bed, and moving from sitting to standing. Plaintiff also reported some numbness and tingling in the left leg. Plaintiff reported that taking medication, relaxing, and applying ice helped relieve the pain. Review of systems showed plaintiff to also complain of depression, mood swings, and anxiety. Physical examination showed tenderness in the lumbar paraspinous

muscles.  Straight leg raising was positive bilaterally.  Plaintiff had full range of motion of the extremities.  Strength and reflexes were full bilaterally.  Mental status examination was normal, with plaintiff demonstrating appropriate recent and past memory and exhibiting no signs of undue depression, anxiety, or agitation.  Dr. Boedefeld diagnosed plaintiff with lumbar radiculopathy of the left lower extremity, lumbar degenerative disc disease, history of lumbar laminectomy at L4-5, and lumbar disc protrusions at L5-S1 with an annular tear.  An epidural steroid injection was administered at the L4-5 level.  (Tr. 243-47.)

Between June 2 and June 28, 2010, plaintiff participated in physical therapy on eight occasions at Sport Rehab.  Progress notes dated June 24 showed plaintiff to continue to complain of low back pain and left foot numbness, with severe antalgia and facial grimacing noted.  The therapist noted plaintiff to have shown some improvement, but that most stretching exercises were not tolerated because of significant pain.  (Tr. 250-56.)

In a letter dated June 28, 2010, Dr. Mirkin detailed his review of multiple medical reports dating from April 2009 through May 2010, which indicated throughout that plaintiff experienced low back pain radiating to his left leg for which plaintiff was getting narcotic pain medication.  From a review of these records, Dr. Mirkin opined that plaintiff's low back pain, leg pain, and MRI

pathology were present before plaintiff's May 20, 2010, work-related injury. (Tr. 301-02.)

Plaintiff returned to Dr. Mirkin on June 30, 2010, and reported having persistent pain in his back that was unresponsive to injection therapy. Physical examination showed plaintiff to walk with an upright gait. Range of motion was seventy percent of normal, and straight leg raising elicited buttock pain. Weakness in the left foot dorsiflexor was noted. Dr. Mirkin advised plaintiff that the only thing he could offer was surgery, to which plaintiff responded that he was not interested. Dr. Mirkin recommended that plaintiff undergo a functional capacity evaluation (FCE). (Tr. 300.)

On July 1, 2010, Dr. Myers refilled plaintiff's prescription for Endocet, noting that plaintiff had a herniated disc at L5-S1. (Tr. 259.)

Plaintiff visited Pro Rehab on July 2, 2010, for purposes of undergoing an FCE for his workers' compensation insurance claim. It was noted that plaintiff had been diagnosed with lumbar strain and currently experienced low back pain. Over the course of the evaluation, plaintiff demonstrated an ability to occasionally lift and carry ten to fifteen pounds; occasionally sit, walk, climb stairs, bend, squat, kneel, and crawl; and frequently stand and reach. Plaintiff had limited range of motion about the lumbar spine and self-terminated some exercises because of

subjective low back pain. It was noted that plaintiff engaged in symptom magnification behaviors and self-limiting effort, leading the evaluator to opine that plaintiff performed at his current tolerance level and not at his true maximum capacity. It was opined that plaintiff could perform full time, light level work. (Tr. 266-80.)

On July 9, 2010, Dr. Mirkin noted plaintiff's physical exam to be unchanged. Noting the results of the FCE, Dr. Mirkin opined that plaintiff could perform work in at least a light duty capacity and "presumably quite a bit more if he were to give a full effort." (Tr. 299.)

Dr. Myers refilled plaintiff's Soma prescription on July 30 and August 26, 2010. (Tr. 338.)

On September 24, 2010, Dr. Myers refilled plaintiff's Soma prescription. Prozac was also prescribed. Plaintiff gave Dr. Myers disability paperwork to complete for his lawyer. (Tr. 337.)

On September 24, 2010, Dr. Myers completed a Physical RFC Assessment wherein he opined that plaintiff could sit, stand, walk, and work less than one hour each in an eight-hour workday. Dr. Myers opined that plaintiff could occasionally lift and carry up to ten pounds but could never lift in excess of such amount. Dr. Myers reported that plaintiff could not use his feet for repetitive movements,

because of degenerative disc disease of the lumbosacral spine. Dr. Myers reported that plaintiff had no impairment that would limit use of his hands. Dr. Myers opined that plaintiff could never engage in any postural activities, such as bending, squatting, climbing, reaching, or kneeling. Dr. Myers further opined that plaintiff could occasionally drive automotive equipment and be exposed to noise, but he should never be around moving machinery or be exposed to unprotected heights, marked temperature changes, or dusts and fumes. Dr. Myers reported that plaintiff experienced constant moderate to severe pain on a daily basis and that objective indicators of such pain included reduced range of motion, muscle spasms, and motor disruption. Dr. Myers reported that plaintiff also experienced depression and has experienced a loss of friends. Dr. Myers opined that plaintiff was totally disabled. (Tr. 322-26.)

In a Mental RFC Assessment completed that same date, Dr. Myers opined that, in the domain of daily living, plaintiff's depression caused him to be markedly limited in his ability to cope with stress, function independently, behave in an emotionally stable manner, relate in social situations, and be reliable. Dr. Myers further opined that plaintiff was slightly limited in his ability to care for himself, dress himself, meet personal needs, and maintain his personal appearance. In the domain of social functioning, Dr. Myers opined that plaintiff was markedly limited

in his ability to visit friends, relate in social situations, interact with the general public, maintain socially acceptable behavior, and adhere to basic standards of cleanliness. Dr. Myers further opined that plaintiff was moderately limited in his ability to ask simple questions or request assistance, and to accept instructions and respond to criticism; and slightly limited in his ability to travel on public transportation. In the domain of concentration, understanding, and memory, Dr. Myers opined that plaintiff was markedly limited in his ability to respond to changes in the work setting, to complete a normal workday and workweek without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Myers further opined that plaintiff was moderately limited in his ability to understand and carry out complex instructions, maintain attention and concentration for extended periods, maintain regular attendance and be punctual, sustain an ordinary routine without special supervision, work in coordination with others, and make simple work-related decisions. Dr. Myers further opined that plaintiff was slightly limited in his ability to remember work-like procedures, understand and remember short and simple instructions, and understand and remember detailed instructions. Dr. Myers opined that plaintiff had continual episodes of deterioration. Dr. Myers further opined that plaintiff had poor or no ability to adjust to a job, except that he

had a fair ability to follow work rules and maintain attention.  (Tr. 328-32.)

On October 22, 2010, Dr. Myers refilled plaintiff's Soma prescription.  On November 22, 2010, Dr. Myers refilled plaintiff's Soma and Prozac prescriptions, noting plaintiff's depression and degenerative disc disease of the lumbosacral spine.  (Tr. 337.)

Dr. Myers refilled plaintiff's Soma prescription on December 21, 2010, and again on January 20, 2011.  On February 18, 2011, Dr. Myers refilled plaintiff's Soma and Prozac prescriptions and questioned whether to change plaintiff's prescription for Endocet inasmuch as the medication's effectiveness was not lasting for six hours.  (Tr. 336.)

Plaintiff's Soma prescription was refilled on March 15 and April 15, 2011; and prescriptions for Soma and Prozac were refilled on May 13, 2011.  (Tr. 335.)

On June 13, 2011, plaintiff reported to Dr. Myers that he was having difficulty sleeping and that he had experienced a death in the family.  Plaintiff's prescription for Soma was refilled, and Trazodone was prescribed.  (Tr. 334.)

## IV. Records Submitted to the Appeals Council[2]

On June 30, 2011, plaintiff underwent a comprehensive medical examination during which Dr. David Volarich detailed plaintiff's medical history showing plaintiff to have had episodes of back pain dating back to September 1991, which related to episodes of lifting or reaching that precipitated the pain. For purposes of the examination, Dr. Volarich reviewed records from Tesson Ferry Spine & Orthopedic Center, Professional Pain Physicians, Phelps County Regional Medical Center, Dr. David's Family Clinic, Pro Rehab, and Sports Rehab; as well as diagnostic studies, including the May 2010 MRI results. At the examination, plaintiff continued to complain of low back pain radiating to both legs, with greater pain on the left. Plaintiff reported that he can sit for about ten minutes and can walk for one block, but needed to use a cane to walk long distances. Plaintiff reported that his pain becomes so severe at times that he cannot walk and instead must crawl. Plaintiff reported having difficulty with lifting. Plaintiff reported that he avoids bending, but he can twist, push, and pull with pain. Plaintiff reported that climbing stairs increases his pain. Physical examination showed weakness in

---

[2] In making its determination to deny review of the ALJ's decision, the Appeals Council considered additional evidence which was not before the ALJ. The Court must consider this additional evidence in determining whether the ALJ's decision was supported by substantial evidence. *Frankl v. Shalala*, 47 F.3d 935, 939 (8th Cir. 1995); *Richmond v. Shalala*, 23 F.3d 1441, 1444 (8th Cir. 1994).

the quadriceps and hamstrings bilaterally because of back pain. Diminished sensation was noted about the left lower extremity along the L5 and S1 nerve roots. Deep tendon reflexes were diminished. Plaintiff was noted to have a limp in his gait because of pain radiating to the left leg. Range of motion was limited about the lumbar spine, and plaintiff experienced increased back pain with toe, heel, and tandem walking, as well as with squatting. Straight leg raising elicited pain bilaterally. Mental status examination showed plaintiff to be depressed with a flat affect. Plaintiff reported being concerned about his chronic pain and that he has trouble performing simple tasks. Dr. Volarich noted plaintiff to otherwise be alert, cooperative, and oriented times three. Upon conclusion of the examination, Dr. Volarich's diagnoses included severe lumbar strain/sprain with aggravation of pre-existing lumbar syndrome and new annular tear at L5-S1; disc herniation L4-5; and depression. Dr. Volarich opined that plaintiff should avoid all bending, twisting, lifting, pushing, pulling, carrying, and climbing; should not engage in more than occasional lifting of weight not exceeding twenty-five pounds; should not handle weight over his head, away from his body, or carried over long distances or uneven terrain; should avoid remaining in a fixed standing and/or sitting position for longer than twenty to thirty minutes; and should change positions frequently and rest when needed. Dr. Volarich recommended that plaintiff undergo appropriate

exercise programs in addition to non-impact aerobic conditioning such as walking, biking, or swimming on a daily basis.  (Tr. 341-50.)

## V.  The ALJ's Decision

The ALJ found plaintiff to meet the insured status requirements of the Social Security Act through December 31, 2014.  The ALJ found that plaintiff had not engaged in substantial gainful activity since May 20, 2010, the alleged onset date of disability.  The ALJ found plaintiff's disc disease to be a severe impairment, but that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ found plaintiff to have the RFC to perform light work,[3] but he needed to alternate between sitting and standing at will.  The ALJ found plaintiff unable to perform his past relevant work.  Considering plaintiff's age, education, work experience, and RFC, the ALJ determined vocational expert testimony to support a finding that plaintiff could perform other work existing in significant numbers in the national economy, and specifically, office helper, laundry press operator, and cashier.  The ALJ thus found that plaintiff was not under a disability from May 20, 2010, through the date of the decision.  (Tr. 21-

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. §  404.1567(b).

29.)

## VI. Discussion

To be eligible for DIB under the Social Security Act, plaintiff must prove
that he is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001);
*Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).
The Social Security Act defines disability as the "inability to engage in any
substantial gainful activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or which has lasted or
can be expected to last for a continuous period of not less than 12 months." 42
U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if his
physical or mental impairment or impairments are of such severity that he is not
only unable to do his previous work but cannot, considering his age, education, and
work experience, engage in any other kind of substantial gainful work which exists
in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a
five-step evaluation process. *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482
U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the
claimant is engaged in substantial gainful activity. If the claimant is working,
disability benefits are denied. Next, the Commissioner decides whether the

claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance, but enough evidence that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007)

(internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the plaintiff's impairments.

6.    The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).  The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).  However, even though two inconsistent conclusions may be drawn from the evidence, the

Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall*, 274 F.3d at 1217 (*citing Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

For the following reasons, the ALJ committed no legal error, and his decision is supported by substantial evidence on the record as a whole. The Commissioner's final decision is therefore affirmed.

A.    Severe Impairment

Plaintiff claims that the ALJ erred by finding his mental impairment, depression, not to be severe.

A severe impairment is an impairment that significantly limits a claimant's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). An impairment is not severe when it has no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 404.1521. The claimant bears the burden of establishing that his impairment is severe. *Kirby v. Astrue,* 500 F.3d 705, 707 (8th Cir. 2007).

Here, the ALJ specifically determined at Step 2 of the evaluation process that plaintiff's mental impairment was not severe. (Tr. 23-24.) In making this determination, the ALJ properly invoked 20 C.F.R. § 404.1520a, which requires an ALJ to determine the severity of a mental impairment by rating the degree of functional loss the impairment causes a claimant to suffer in the areas of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c), (d).

> When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. . . .
>
> . . .
>
> If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe . . . .

20 C.F.R. § 404.1520a(c)(4)-(d)(1). The ALJ summarized the evidence of record and, after undergoing the required analysis, found plaintiff's mental impairment to result in no limitations in plaintiff's daily activities or in social functioning; mild limitations in maintaining concentration, persistence, and pace; and to have resulted in no repeated episodes of decompensation. The ALJ thus concluded that

plaintiff's mental impairment was not severe.  (Tr. 23-24.)  For the following reasons, substantial evidence on the record as a whole supports this determination.

As noted by the ALJ, plaintiff reported in his Function Report that he lives alone, takes care of his personal needs, prepares his own meals, performs household chores, and does his own grocery shopping.  To the extent plaintiff reported any limitation in these activities, he attributed such limitation to pain and not to the effects of any mental impairment.  (*See* Tr. 174-77.)  The ALJ also noted that plaintiff reported visiting daily with family and that he had no difficulty getting along with family, friends, neighbors, or others.  (*See* Tr. 178-79.)  Although plaintiff also reported that he no longer had a social life (Tr. 179), the undersigned notes that plaintiff nevertheless testified at the hearing that he played pool once every month or two months.  (Tr. 51-52.)  Based on this record, the ALJ did not err in finding plaintiff not to be limited in his activities of daily living or in social functioning.  In addition, the ALJ noted plaintiff's self-report that he is able to drive, shop, pay bills, maintain banking accounts, manage his checkbook, and use money orders to support his finding that plaintiff had no more than mild limitations in concentration, persistence, or pace.  The ALJ further supported this finding with his observation that various treating sources reported that plaintiff's memory functions were appropriate and that he exhibited no evidence of

depression or anxiety.  *See, e.g., Buckner v. Astrue*, 646 F.3d 549, 557 (8th Cir.

2011) (claimant attributed limitations to physical impairment instead of mental

impairment; normal psychological evaluations throughout relevant period).

To the extent Dr. Myers' September 2010 Mental RFC Assessment lists

multiple marked limitations effectively precluding plaintiff's mental ability to

perform work, the ALJ properly discounted Dr. Myers' opinions inasmuch as they

were inconsistent with his treatment records, as well as with the evidence of record

when viewed as a whole.  (Tr. 27.)  An ALJ is permitted to discount a treating

physician's medical source statement "where the limitations listed on the form

'stand alone' and were 'never mentioned in [the physician's] numerous records of

treatment' nor supported by 'any objective testing or reasoning.'"  *Reed v.*

*Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005) (*quoting Hogan v. Apfel*, 239 F.3d

958, 961 (8th Cir. 2001)).  *See also Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir.

2011) (little evidentiary weight accorded to functional limitations set out in

medical source statement check-off form, because previous treatment notes did not

report any significant limitations); *Halverson v. Astrue,* 600 F.3d 922, 930 (8th Cir.

2010) (inconsistency between treating physician's treatment records and his

functional assessment provides good reason for ALJ to discount physician's

opinion).  Indeed, the undersigned notes that Dr. Myers first prescribed

psychotropic medication on the day plaintiff requested him to complete the Mental RFC Assessment, and no diagnosis of depression appears in any treatment note until two months after Dr. Myers completed the Assessment. *Cf. Page v. Astrue*, 484 F.3d 1040, 1044 (8th Cir. 2007) (no objective medical evidence of mental impairment; timing of treatment appeared related to disability claim); *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995) (encounters with doctors appeared to be linked primarily to quest to obtain benefits rather than to obtain medical treatment). A diagnosis of depression alone does not necessarily equate with a finding that the impairment is "severe." *Buckner*, 646 F.3d at 557.

Finally, to the extent plaintiff argues that Dr. Volarich's June 2011 examination supports a finding that plaintiff's mental impairment is severe, the undersigned notes that while Dr. Volarich observed plaintiff to be depressed, have a flat affect, and to be concerned about his pain, he also observed plaintiff to otherwise be alert, cooperative, and oriented as to person, place and time. Notably, Dr. Volarich listed specific physical limitations with respect to plaintiff's ability to perform work, but he provided no limitations with respect to plaintiff's mental ability. A review of Dr. Volarich's evaluation does nothing to detract from the ALJ's finding at Step 2 of the evaluation process that plaintiff's mental impairment was not severe.

The ALJ underwent the proper analysis in determining that plaintiff's mental impairment did not rise to the level of a severe impairment under the Regulations, and substantial evidence on the record as a whole supports this determination. While plaintiff argues that an inconsistent position may be drawn from the evidence, the Court must affirm the ALJ's decision if it is supported by substantial evidence. Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005).

B.     Physical RFC

The ALJ found plaintiff to have the RFC to perform light work with an additional restriction to the performance of work allowing an at-will sit/stand option. Plaintiff argues, however, that light work requires occasional stooping[4] and that his inability to engage in stooping or bending precludes his performance of such work.[5] Assuming *arguendo* that the ALJ erred by failing to include a stooping and/or bending limitation in his RFC, such error was harmless.

At Step 5 of the sequential analysis, the Commissioner bears the burden of production to demonstrate that the claimant can perform other work as it exists in

---

[4] Plaintiff cites SSR 83-10 to support this argument. SSR 83-10 states that "[t]he lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping." 1983 WL 21251, at *6 (S.S.A. 1983). The undersigned presumes it to be this statement upon which plaintiff's relies to support his claim that light work requires occasional stooping.

[5] With respect to postural limitations, stooping is defined as "bending the body downward and forward by bending the spine at the waist[.]" SSR 85-15, 1985 WL 56857, at *7 (S.S.A. 1985). Stooping, kneeling, crouching, and crawling are all forms of bending. *Id.*

significant numbers in the national economy.  *Goff*, 421 F.3d at 790.  To satisfy

this burden here, the ALJ elicited the testimony of a vocational expert who testified

that a person with plaintiff's RFC and vocational factors could perform work as an

office helper, laundry press operator, and cashier.  *See Baker v. Apfel*, 159 F.3d

1140, 1144 (8th Cir. 1998) (Commissioner may satisfy Step 5 burden with

vocational expert testimony).  With each of these jobs, the ALJ expressly referred

to the *Dictionary of Occupational Titles* (DOT) in his decision, finding plaintiff

able to perform such work.  (*See* Tr. 29.)  With respect to the jobs of laundry press

operator and cashier, the DOT describes this work as not requiring any stooping or

any other form of bending inasmuch as these postural activities do not exist in the

respective jobs.  *See* DOT 363.685-026 (shirt presser), 1991 WL 673023; DOT

211.462-010 (cashier II), 1991 WL 671840.  The vocational expert testified that

7,250 of these jobs, combined, existed in the St. Louis area and 450,000 nationally.

Because there is a significant number of laundry press operator jobs and cashier

jobs that plaintiff is capable of performing with his RFC, even taking into account

plaintiff's claimed inability to stoop or bend, the ALJ did not err in finding plaintiff

able to perform this other work as it exists in significant numbers in the national

economy.  20 C.F.R. § 404.1566(b) ("Work exists in the national economy when

there is a significant number of jobs (in one or more occupations) having

requirements which you are able to meet[.]"); *Weiler v. Apfel*, 179 F.3d 1107, 1110-11 (8th Cir. 1999) (vocational expert's testimony that 32,000 positions existed nationwide in occupation that could be performed by person with claimant's vocational factors and RFC constituted substantial evidence that a significant number of jobs existed in the economy that claimant could perform).

Accordingly, the ALJ's failure to include plaintiff's claimed inability to stoop or bend in his RFC determination did not affect his finding at Step 5 of the sequential analysis that plaintiff could perform other work as it exists in significant numbers in the national economy inasmuch as such other work does not require these postural activities. The ALJ's claimed error in failing to include these postural limitations in plaintiff's RFC was therefore harmless. *Byes v. Astrue*, 687 F.3d 913, 918 (8th Cir. 2012) (ALJ's claimed error in determining claimant's RFC did not affect outcome).

## VII.  Conclusion

For the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ's determination that plaintiff was not disabled from May 20, 2010, through the date of the decision is supported by substantial evidence on the record as a whole, and plaintiff's claims of error should be denied. Inasmuch as there is substantial evidence to support the Commissioner's decision, this Court may not

reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001); *see also Buckner,* 646 F.3d at 556.

Therefore,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.


_____
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE



Dated this  24th day of June, 2014.